UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| -v.- | : |
| | S8 10 Cr. 336 (LAK) |
| RAYMOND BITAR, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States*
*of America*

Arlo Devlin-Brown
Assistant United States Attorney
   *- Of Counsel -*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

   -v.-                                              :

                                                                       S8 10 Cr. 336 (LAK)

RAYMOND BITAR,                         :

        Defendant.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The Government moves for the pre-trial detention of Raymond Bitar (the "defendant") on the grounds "no condition or combination of conditions will reasonably assure the appearance" of the defendant in Court. 18 U.S.C. § 3142(e)(1). The defendant is charged with defrauding Full Tilt Poker players of approximately $350 million dollars, has millions of dollars in offshore bank accounts to support a life as a fugitive, and has already demonstrated a willingness remain abroad to avoid less serious charges.

### Background

Raymond Bitar, a United States citizen, is the founder, Chief Executive Officer, and partial owner of Full Tilt Poker. In 2006, Full Tilt Poker moved its operations to Ireland and Bitar relocated to Dublin, though he maintained property in the United States traveled back and forth between Ireland and the United States regularly for business and pleasure. That travel stopped, however, in early 2011, when Bitar concluded for several reasons (including, likely, from discussions Full Tilt Poker' company counsel had with the Government in late 2010) that an indictment could be imminent. Bitar then cancelled a reservation he had made for travel to

1

the United States in early March and, for the first time since he had relocated to Ireland, failed to return to the United States in advance of his April 14 birthday.

On April 15, 2011 an indictment was unsealed charging Bitar and ten other defendants with gambling, bank fraud, and money laundering offenses relating to the operation of Full Tilt Poker, Pokerstars and Absolute Poker.  Bitar engaged a New York criminal defense lawyer, Richard Levitt, who contacted the United States Attorney's Office shortly after the indictment was unsealed and intermittently thereafter.  The Government's message was consistent: if Bitar wanted to address the pending charges, he needed to return promptly.

Bitar chose not to return.  Nor did he step down as CEO of Full Tilt Poker, instead fighting off an effort by passive shareholders of the company (which is held predominantly by United States poker players) to replace Bitar and the company's board.  Bitar told Full Tilt Poker's shareholders in substance that he could not step aside, that his role at the company was too critical, and that he and only he could raise money from new investors who might acquire a controlling stake in the company to support its continued operations outside the United States.  This struck several of the shareholders as preposterous – how could a CEO indicted on bank fraud and money laundering charges that he declined to face be the best person to represent the company with new investors? –  but Bitar, backed by several allies, held on to control.

In retrospect, the impetus of Bitar's desire to remain at the helm is clear.  As of the date the indictment was unsealed, Full Tilt Poker was little more than a Ponzi scheme, and Bitar wanted to prevent it from unraveling.  Specifically, as Bitar knew, Full Tilt Poker was in a perilous financial position even prior to the indictment.  It owed players around the world over $350 million and, according to one company financial statement, only had $60 million in its bank

2

accounts shortly before the indictment was unsealed. The indictment forced Full Tilt Poker to shut down in the United States, and U.S. players waited for the company to return the approximately $150 million owed to U.S. players, money that the company could not pay. Indeed, the limited cash the company still had after April 15, 2011 was being withdrawn rapidly by players outside of the United States, undoubtedly unnerved by the U.S. enforcement action. Bitar directed the company to keep taking money from players outside the U.S. – promising them that it would be "safe" – and then used incoming cash to pay some of the pending withdrawal requests from other non-U.S. players, as well as cover the company's operating expenses.

Full Tilt Poker's increasingly desperate game of robbing Peter to pay Paul continued until June 29, 2011, when Full Tilt Poker's chosen regulator, the Channel Islands-based Alderney Gambling Control Commission ("AGCC") cut the power to Full Tilt Poker's servers and terminated its operations worldwide. Even after this Bitar stayed in Ireland and declined to return to the United States, claiming in statements to others that his personal presence in the country and at the helm of the company was essential to negotiating an asset sale to repay the players that Bitar had just caused to lose yet more money after his indictment. Bitar's inability to repay players did not mean an inability to continue paying himself, however, and Bitar withdrew over $2 million salary payments after the original April 15, 2011 indictment.

Approximately one month ago, Paul Weiss informed the Government that it now represents Bitar. Defense counsel subsequently informed the Government that Bitar would arrive in the United States on a flight landing at JFK airport on Monday, July 2, and arrangements were made to arrest Bitar on his arrival. Upon Bitar's return, a superseding indictment (S8 10 Cr. 336, or the "Superseding Indictment") was unsealed that accused Bitar of fraud against Full Tilt

3

Poker's own customers.

In summary, the Superseding Indictment alleges that Bitar, in an effort to convince customers to entrust their money to Full Tilt Poker, approved false and misleading statements about the safety of such deposits, including claims that player funds would be held in "segregated accounts" that were "separate and distinct" from company operating accounts, and that player funds would be transferred to company accounts only when the company was entitled to a particular fee from the players. In truth, player funds were freely intermingled with company funds in accounts which were used as Bitar directed, including funding marketing campaigns and paying Bitar and the company's other owners at least $430 million in distributions. As a result, Full Tilt Poker developed an increasing shortfall between what it owed players and what it had in its bank accounts. To help mask the company's financial problems, Bitar directed his finance department – which was required to certify monthly to the AGCC that Full Tilt Poker held 100% of player deposits as "cash" – to use a false and misleading definition of the term. Specifically, Bitar counted as company "cash" funds that were simply *owed* to Full Tilt Poker by third party payment processors and which had in many cases, as Bitar well knew, had been forfeited pursuant to judicial order or simply been stolen by the processor in question. It was these practices that left Full Tilt Poker unable to pay the $350 million it owed players when the company was shut down in 2011.

Following his arrest on July 2, 2012, Bitar appeared before Magistrate Judge Debra Freeman for arraignment (a transcript is attached). The Government sought detention on the grounds that the serious charges Bitar faced and millions of dollars of assets he maintained abroad presented a risk of flight that could not be addressed by any bail conditions, particularly

as the defendant had already demonstrated a willingness to remain out of the United States for over 14 months before returning to face the less serious original charges.  The defendant sought bail on a $250,000 bond, pointing to the defendant's ultimate decision to return as strong evidence he did intend to appear in Court when required going forward.  Magistrate Judge Freeman, describing the case as "a close call in terms of whether I should have ordered detention," set a $2.5 million bond, signed by five co-signers, and secured by $1 million in cash or property, with the defendant detained until conditions were met  (Tr. 48-49).  The defendant estimated that this would take a week.  (Tr. 47).  Accordingly, the Government advised the defendant on July 3, 2012 that it intended to appeal the denial of detention order at the initial conference before the Court on Monday, July 11.

## Applicable Law

Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," he or she shall order the defendant detained pending trial. 18 U.S.C. § 3142(e). While bail may originally be set by a United States Magistrate Judge, the review of a presiding district judge is *de novo*.  *United States v. Zuccaro*, 645 F.2d 103 (2d Cir. 1981).

In seeking pre-trial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks.  *See* 18 U.S.C. § 3142(f); see also *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436

5

(2d Cir. 2001); *United States v. Friedman*, 837 F.2d 48, 29 (2d Cir. 1988); *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987).

## Argument

The defendant presents a risk of flight that cannot be addressed by any bail condition because he faces very serious charges and has millions of dollars offshore, which could be used to fund life as a fugitive and easily compensate those signing any bond should he flee.  On top of this, the defendant has already demonstrated his willingness to remain abroad and avoid arrest, deciding to do so for over fourteen months following his original indictment on charges that carried a far lower risk of significant jail time than those in the instant Superseding Indictment.

As an initial matter, the charges unsealed following the defendant's return carry the real possibility of a lengthy prison sentence.  The Superseding Indictment charges three counts of wire fraud against Full Tilt Poker's customers relating to misrepresentations about the safety of their funds.   Since customer funds were not held in "segregated" accounts as promised, Full Tilt Poker, could not, and did not, return to customers the $350 million it owed them after being shut down last year.  The fraud guideline provides for a base level of 7 and a 28 level enhancement for losses over $200 million.  *See, e.g.,* U.S.S.G. § 2B1.1(a)(1) and (b)(O).  With enhancements for 250 victims (U.S.S.G. § 2B1.1(b)(2)(c) and because a substantial part of the scheme was committed from outside the United States (U.S.S.G. § 2B1.1(b)(9)), the total guidelines range in this scenario would be life imprisonment. While the ultimate  Guidelines range the defendant will actually face cannot yet be determined with certainty, there is no question that the defendant faces the likelihood of a substantial prison sentence should he remain in the United States and be convicted.

Importantly, the wire fraud charges that carry these penalties were not public before the defendant's return.[1]  Instead, the defendant flew back knowing only of the previously filed indictment which, due to the operation of the gambling and money laundering guideline and the lack of sizeable bank losses, would have yielded a Guidelines range of no more than a few years.[2]

In addition to a powerful incentive to flee, the defendant has assets abroad that could support life as a fugitive.  The defendant made at least $40 million from Full Tilt Poker (based on salary, bonus and "profit" distributions available from company financial records) and has provided no accounting for where those funds now are.  The information provided by the defendant to Pretrial Services referred to approximately $2.5 million in cash (but this was not verified, and no specifics were provided about where the cash was) and several million more in various similarly unspecified business interests.  The information provided to Pretrial Services was also not complete, as it omitted millions more in bank accounts overseas.  While the defendant discounted these overseas assets on the grounds that "most" of them have "been

---

[1]   While the defendant claimed during bail argument before Magistrate Judge Freeman that "Mr. Bitar came back today knowing full well that there were underlying charges against him," (Tr. 14-15), notion that Bitar "knew" additional charges were pending is unsupported.  Bitar did know that a *civil* forfeiture complaint containing some (but not all) of the allegations relating to player accounts was filed in September 2011.  Bitar might have concluded from that civil filing and the lack of any subsequent filing in the criminal case (despite what Bitar knew had been an investigation) that the Government had either decided not to proceed criminally or, at least,  had not yet made a charging decision.   Bitar assuredly knew that there was a *risk* he could be charged with a more serious offense but may have similarly forecast that by returning to the U.S. on his own he would be released on bail, and thus have an opportunity to reverse that decision and leave should the worst case scenario come to pass.

[2]   The most serious offense, money laundering, relies on the base offense level attributable to the underlying offense of gambling (level 12), with four points of additional likely enhancements.  *See* U.S.S.G. § 2S1.1(a)(1), (b)(2)(B) and (b)(3).

already frozen and seized as part of the Government's action" (Tr. 20)[3] the fact is that earlier this year the defendant attempted to access over $24 million held in his name in a foreign bank account that had <u>not</u> been listed in the Indictment or restraining order and of which the Government had not been aware.  When the Government learned of this and advised Bitar's then lawyer that Bitar of its concern, counsel for Full Tilt Poker suggested that Bitar had likely only been trying to access the funds in an effort to cooperate with the United State's Attorney's Office's asset forfeiture unit (apparently surreptitiously) to raise money to repay the players.  The recent discovery of these accounts raises questions about Bitar's willingness to comply with the restraining order (while the specific foreign accounts were not listed, the funds in those accounts could be traced to other accounts identified in the order) and about what other overseas accounts Bitar may have.

      Bitar's wealth raises a tremendous risk of flight as overseas assets could be used to support a life outside the United States and potentially to reimburse Bitar's friends and family costs associated with the forfeiture of his bail bond.  Moreover, the lack of transparency regarding Bitar's assets (particularly as many are outside of the United States) makes it impossible to reliably determine what size bond – if any – would be sufficient to guard against this risk of flight.  It would be nearly impossible to prevent Bitar from crossing the border into Mexico from California (where the bail order permits him to reside) and from there traveling

---

[3] Importantly, the fact that a foreign bank account is listed in the restraining order the Court issued in connection with the prior indictment does *not* mean that the United States Government has control over the foreign bank account or even information as to how much money is in such an account; the cooperation of foreign governments in effectuating the requested restraint and the amount of legal process required to do so varies significantly.  Thus the fact that a foreign bank account in Bitar's name is identified in the restraining order does not necessarily put those funds beyond Bitar's reach.

onward to other locations, potentially with real or forged foreign travel documents that the defendant has had over a year from the original indictment to obtain.

Finally, the question of whether Bitar would actually act on these incentives – choose to live on wealth abroad rather than face U.S. charges – does not require speculation.  Bitar, charged with substantially less serious offenses on April 15, 2011, elected to remain in Ireland for over a year, choosing to continue to operate a company that was by then little more than a Ponzi scheme, rather than face the offense in the United States.  The risk of flight is to be assessed in part based on the "history and characteristics of the person" seeking bail, 18 U.S.C. § 3142(g), and recent history here demonstrates both the low priority Bitar placed on addressing the United States charges and his willingness to stay out of the United States, and away from the friends and family he now offers as co-signers, for an extended period of time.  That the defendant eventually decided to return to face the prior version of the charges – shortly before new ownership was expected to take over at Full Tilt Poker and terminate Bitar anyway, jeopardizing his ability to remain in Ireland – provides little assurance that a subsequent reassessment will not cause Bitar to decide that he would rather leave the United States again than appear in Court again at some point in the future.

**Conclusion**

For the reasons set forth above, the Government respectfully submits that the defendant be detained pending trial.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   /s/ Arlo Devlin-Brown
      Arlo Devlin-Brown
      Assistant United States Attorney
      Tel. (212) 637-2506