USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUN 2 8 2012

Sealed
(AL)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA              :   SUPERSEDING
                                   :   INDICTMENT

      -v-                     :

                                   :

RAYMOND BITAR,                 :
    and
NELSON BURTNICK,           :   S8 10 Cr. 336 (LAK)

                                   :

                                   :

             Defendants.     :

- - - - - - - - - - - - - - - - - -x

## COUNT ONE

(Unlawful Internet Gambling Enforcement Act Conspiracy)

       The Grand Jury charges:

### Introduction

    1.  On or about October 13, 2006, the United States enacted the Unlawful Internet Gambling Enforcement Act ("UIGEA"), making it a federal crime for gambling businesses to "knowingly accept" most forms of payment "in connection with the participation of another person in unlawful Internet gambling." Notwithstanding the enactment of UIGEA, Full Tilt Poker – a company founded by United States professional poker players in 2004 – continued to offer internet gambling on poker to United States residents, and took in at least an estimated $1 billion from United States residents through April 15, 2011.

    2.  Because United States banks were largely unwilling to process payments for an illegal activity such as internet gambling, Full Tilt Poker used fraudulent methods to avoid bank

restrictions and to receive hundreds of millions of dollars from United States residents who gambled through Full Tilt Poker. Defendants RAYMOND BITAR and NELSON BURTNICK conspired with others to deceive United States banks and financial institutions into processing hundreds of millions of dollars for Full Tilt Poker, by, among other things, arranging for the money received from United States gamblers to be disguised as payments to numerous non-existent online merchants and other non-gambling businesses.

3.   To encourage players to deposit money with Full Tilt Poker, RAYMOND BITAR, the defendant, directed Full Tilt Poker employees to assure potential customers that player deposits would be held in "segregated accounts" that would be kept "separate and distinct" from the company's operating accounts.  In truth and in fact - and as BITAR well knew - Full Tilt Poker did not protect player funds in separate accounts and instead used player funds for whatever purposes BITAR directed, including to pay BITAR and the other owners of Full Tilt Poker hundreds of millions of dollars.  Accordingly, when Full Tilt Poker was forced to stop operating - first in the United States in April 2011 and then internationally in June 2011 - it was unable to repay players around the world the approximately $350 million it owed them.

## The Defendants And Their Companies

4.     At all times relevant to this Indictment, RAYMOND
BITAR, the defendant, was a founder, owner, and Chief Executive
Officer of Full Tilt Poker.  From in or about January 2009 up
through and including at least in or about June 2012, NELSON
BURTNICK, the defendant, was the Director of Payment Processing
for Full Tilt Poker.  Prior to joining Full Tilt Poker BURTNICK
was the head of the payment processing department for Full Tilt
Poker's principal competitor, Pokerstars.  Through its website,
fulltiltpoker.com, Full Tilt Poker provided real-money gambling
on internet poker games to customers in the United States and
certain other countries.

5.     At all times relevant to the Indictment, Full Tilt
Poker operated through a group of related companies all
beneficially owned and controlled by Tiltware LLC, a California
Limited Liability Company.  Tiltware LLC's owners included
RAYMOND BITAR, the defendant, and approximately 22 other
individuals, many of whom were well known professional poker
players.  Defendants RAYMOND BITAR and one of these professional
poker players, a co-conspirator not named a defendant herein
("CC-1"), were at all times relevant to the indictment the co-
managers of Tiltware LLC.  Tiltware LLC operated Full Tilt Poker
through several other privately held corporations and other
entities, including but not limited to Kolyma Corporation A.V.V.,

Pocket Kings Ltd., Pocket Kings Consulting Ltd., Filco Ltd., Vantage Ltd., Ranston Ltd., Mail Media Ltd., and Full Tilt Poker Ltd. (collectively, "Full Tilt Poker"). Full Tilt Poker operated in Ireland, where it maintained its principal headquarters, and in the United States, among other places.

### The Defrauding of Financial Institutions

6.   Because internet gambling was illegal, Full Tilt Poker was not permitted by United States banks to open bank accounts in the United States to receive proceeds from United States gamblers. To defeat this ban, defendants RAYMOND BITAR, NELSON BURTNICK and their co-conspirators devised various deceptive means designed to trick United States banks and financial institutions into processing gambling transactions on Full Tilt Poker's behalf.

Fraudulent Credit Card Processing

7.   At all times relevant to the Indictment, Visa and MasterCard required banks that processed credit card transactions for merchants (so-called "acquiring banks") to apply a particular transaction code to internet gambling transactions. At all times relevant to the Indictment, most U.S. banks issuing credit cards to U.S. residents (so-called "issuing banks") elected not to extend credit to customers for internet gambling purposes and as a matter of policy automatically declined transactions bearing that internet gambling transaction code.

8.   In order to circumvent the Visa and MasterCard regulations and trick U.S. banks into authorizing their internet gambling transactions, RAYMOND BITAR and NELSON BURTNICK, the defendants, worked with others to apply incorrect codes to Full Tilt Poker internet gambling transactions in order to disguise the nature of those transactions and create the false appearance that the transactions were unrelated to internet gambling.  As a result of this deception, United States issuing banks were tricked into approving payments for internet gambling that would have automatically been rejected if properly coded.

Fraudulent E-Check Processing

9.   In addition to the fraudulent credit card processing, RAYMOND BITAR and NELSON BURTNICK, the defendants, arranged to electronically transfer funds from the checking accounts of United States residents in a way that disguised that the transactions were for internet gambling.

10.  At all times relevant to this Indictment, the Automated Clearinghouse (or "ACH") system was an electronic network, administered by the Federal Reserve, that allowed for electronic fund transfers to and from United States bank accounts through "e-checks" or "electronic checks."  A principal difficulty for Full Tilt Poker in e-check processing was that the ACH system required the merchant to open a processing account at a United States-based Originating Depository Financial

5

Institution (or "ODFI").  Because Full Tilt Poker was not legally able to offer gambling in the United States, it could not – and did not – open bank accounts for e-check processing in its own name.  Instead, RAYMOND BITAR and NELSON BURTNICK, the defendants, hired agents to create dozens of phony companies, complete with fake websites, and to open bank accounts using the names of these phony companies as a cover to process payments for Full Tilt Poker.

### The Corruption of Financial Institutions

11.  In addition to processing transactions by lying to financial institutions, RAYMOND BITAR and NELSON BURTNICK, the defendants, worked with co-conspirators who sought out small banks on the verge of failure that were willing to accept millions of dollars in "investment" in return for processing gambling transactions.  For example, from November 2009 through November 2010, Full Tilt Poker relied on Sunfirst Bank in Saint George, Utah to process tens of millions of dollars in poker transactions in return for a multi-million dollar investment in the bank.  After the Federal Deposit Insurance Corporation ordered Sunfirst Bank to cease such processing, Full Tilt Poker relied on two single branch banks in Illinois – All American Bank and New City Bank – to process millions of dollars in transactions in return for investments in these banks.  All three banks have since failed and been seized by bank regulators,

causing estimated losses to the Federal Deposit Insurance
Corporation of over $70 million.

### The Defrauding of Customers

<u>Lies About Segregated Accounts</u>

12.  Following the enactment of UIGEA, players in the
United States and elsewhere inquired of Full Tilt Poker as to
whether the money they were depositing with the company was safe.
As set forth below, from at least March 2008, RAYMOND BITAR, the
defendant, directed Full Tilt Poker employees to falsely assure
prospective customers that player funds were protected in
"segregated accounts" that were "separate and distinct" from the
company's operating accounts.  However, as BITAR well knew, these
representations were simply lies intended to fraudulently induce
customers to do business with, and entrust their money to, Full
Tilt Poker.

13.  By way of example, on or about March 17, 2008, a
potential customer ("Customer 1") e-mailed Full Tilt Poker
customer support, writing that he was "very concerned about the
risk of depositing money" with Full Tilt Poker and asking "is my
money that I have in my Full Tilt account held in trust?"  On or
about March 18, 2008 a Full Tilt Poker customer service manager
forwarded Customer 1's e-mail to RAYMOND BITAR and CC-1 and asked
how to reply.  On the same day, RAYMOND BITAR responded by e-
mail, copying CC-1, "The best we can say is we keep a 100% of

7

players [sic] funds in segregated accounts.  Funds will always be available to players 24 hours a day after a reasonable fraud check."  On or about March 19, 2008, after receiving BITAR's response, the customer service manager e-mailed the following response to Customer 1 (which was then forwarded to BITAR and CC-1):

> Full Tilt Poker takes the security of our player's money very seriously indeed. To protect our players and our business from financial problems, all player accounts are segregated and held separately from our operating accounts. Unlike some companies in our industry, we completely understand and accept that player account money does not belong to us. It belongs to our customers. Player account funds are available to the account holder 24 hours a day, 7 days a week, 365 days a year, and all withdrawals are processed immediately upon completion of a review for fraudulent activity.

14.  On or about March 22, 2008, Customer 1 emailed Full Tilt Poker in reply to the company's initial response, seeking clarification as to whether "player funds are held in segregated accounts which can't be used by the company itself." RAYMOND BITAR, the defendant, reviewed and indicated by e-mail that he approved a draft response to Customer 1 that read in part as follows:

> Players' funds at Full Tilt Poker are kept in several deposit accounts throughout the world, all of which are separate and distinct from our operating accounts. Funds are transferred from the players' deposit accounts to Full Tilt Poker's operating accounts only after we have earned them. This

8

is not done each time Full Tilt earns a rake
or even daily, but as Full Tilt's earnings
accumulate, we make periodic transfer of the
earnings from the Deposit Accounts to the
Operating Accounts, from which we then pay
outside expenses, Full Tilt employees and
ultimately, the shareholders of the
company....

In closing we would also like to say that you
are always welcome to withdraw some or all of
your funds if you feel uncomfortable. But we
would also like to assure you that they are
not at all at risk, except when you use them
to play, and there is no poker site on the
Internet where they would be any safer.

15.   On multiple occasions from 2008 up through and
including at least the fall of 2010, Full Tilt Poker used the
language RAYMOND BITAR, the defendant, had approved to Customer 1
as the basis for form e-mails sent routinely to other players who
e-mailed Full Tilt Poker about the safety of their funds. Full
Tilt Poker also used this language to respond to comments posted
on a leading poker internet forum regarding player worries that
Full Tilt Poker used player accounts to cover the company's
advertising and other operating expenses. Specifically, a
representative of Full Tilt Poker assigned to monitor and respond
to forum messages posted the following response on or about July
18, 2008:

I'm not sure where most of the information in
this thread is coming from, but I do want to
clear up the most important piece of bad info
. . . . Players' funds at Full Tilt Poker
are kept in several deposit accounts
throughout the world, all of which are
separate and distinct from our operating

9

accounts.  Funds are transferred from the
players' deposit accounts to Full Tilt
Poker's operating accounts only after we have
earned them.

16.  In truth and in fact, contrary to the
representations that RAYMOND BITAR, the defendant, directed be
made about segregated player accounts, at no time in its history
did Full Tilt Poker protect player funds in separate accounts.
Instead, at all relevant times, Full Tilt Poker simply
transferred the player funds it collected from third party
payment processors into company bank accounts, where player funds
were combined with company funds.  Full Tilt Poker used the
proceeds of these intermingled company/player bank accounts as
BITAR directed, including to pay company operating expenses and
to pay BITAR and the company's other owners a total of over $430
million dollars from in or about 2007 through in or about April
2011. Of this total, BITAR personally received at least
approximately $41 million from these intermingled accounts as
salary and "profit" sharing.

17.  RAYMOND BITAR, the defendant, was also aware that
the assurances he was directing his employees to provide to
prospective customers about the safety of their funds were
materially misleading.  On or about March 23, 2008, BITAR e-
mailed CC-1 and Full Tilt Poker's general counsel that while they
needed "a good canned response to send to the one or two guys

that write in a month" about the safety of their money the
"bottom line is we are not a bank" even though "we might act like
one" and therefore customer funds "will always be at risk."

Lies About Cash On Hand

    18.  By using player funds to finance Full Tilt Poker's
operations and pay its owners, Full Tilt Poker developed a
substantial and increasing shortfall between cash it had in its
bank accounts and the money it owed to players. Full Tilt Poker
was required by its regulator, the Channel Islands-based Alderney
Gambling Control Commission ("AGCC"), to keep, as cash, 100% of
money owed to players. To hide the fact that the company was not
holding 100% of player deposits as cash – and was in fact simply
using player funds to cover operating expenses and pay the
company owners – RAYMOND BITAR, the defendant, directed Full
Tilt Poker's Director of Finance ("CC-2") to inflate the amount
of the company's "cash" on hand.  Specifically, BITAR told CC-2
to count as company "cash" over $100 million that third party
payment processors owed to Full Tilt Poker but had never paid the
company and in many cases never would because, for example, the
processor had stolen the money or because the funds had been
seized pursuant to U.S. Court order.

    19.  Acting at BITAR's direction, CC-2 routinely
submitted false monthly financial certifications to the AGCC that
claimed the company had far more cash on hand than it actually

11

did. For example, CC-2 submitted a financial statement to the AGCC stating that Full Tilt Poker had $370,801,074 in "total cash held" as of August 31, 2010, comfortably in excess of the $322,472,894 the company reported owing to players.  In truth and in fact - as reflected by an internal financial report prepared for CC-2 and BITAR - Full Tilt Poker had only approximately $124,342,485 of cash in its bank accounts at the end of August 2010, over $200 million less than it had reported as cash to the AGCC, and nearly $200 million less than the company actually owed to players.

20.  RAYMOND BITAR, the defendant, was aware that keeping less than 100% of player deposits as cash on hand jeopardized the safety of player money. For example, on or about March 15, 2008, during a recorded conference call with Full Tilt Poker owners, BITAR and CC-1 told the owners that maintaining at least 100% of player funds in cash was essential because customer money that was in the hands of third party payment processors could be stolen by the processors as it had been in the past. Indeed, during the March 15, 2008 conference call, BITAR and CC-1 discussed the risk that the Department of Justice could take action against the company and the corresponding need to hold cash at the company to repay players should law enforcement action occur.  Notwithstanding his discussions about such risks, BITAR allowed Full Tilt to operate with far less available cash

than was required to cover obligations to players, and Full Tilt
Poker simply and willfully concealed the truth about its finances
through false statements to the AGCC about its cash on hand.

Lies About Ability To Collect Player Deposits

     21.  Full Tilt Poker's ability to offer "real money"
internet poker in the United States was dependent on its ability
to reliably collect funds from U.S. player bank accounts and
distribute funds to players seeking withdrawals.  Throughout
2010, NELSON BURTNICK and RAYMOND BITAR, the defendants, were
increasingly unable to find payment processors who could reliably
collect Full Tilt Poker deposits from the bank accounts of United
States customers through electronic checks. On or about November
9, 2010, Full Tilt Poker lost the ability to collect such
deposits entirely, meaning, as a practical matter, it could no
longer operate a "real money" internet poker business in the
United States.  As of November 9, 2010, Full Tilt Poker owed its
customers approximately $344 million but had only approximately
$145 million in all of the company bank accounts.

     22.  Rather than terminate its United States operations
– an option that would likely have exposed the fact that Full
Tilt Poker was not holding player cash in "segregated" accounts
and in fact was holding as cash less than half of the money it
owed players – RAYMOND BITAR and NELSON BURTNICK, the defendants,
concocted a method to temporarily disguise the company's problems

while reducing its ability to pay its customers still further. Specifically, BITAR and BURTNICK directed that when a United States player sought to deposit money through Full Tilt Poker's website, Full Tilt Poker would approve the deposit and award credit to the player's online gambling account as if all systems were functioning normally, even though Full Tilt Poker had not actually collected the money from the player and had no ability to do so. As United States players gambled and won or lost these phantom funds – ultimately totaling over $130 million – Full Tilt Poker would list the phantom funds on players' online account statements. Full Tilt Poker did so even though the funds were never in fact collected, or actually available to pay the winning players.

23. As a result of the above practice, the gap between the account balances Full Tilt Poker reported to players, on the one hand, and the amount of cash the company actually had available to pay players, on the other, widened still further. In fact, on or about February 1, 2011, RAYMOND BITAR, the defendant, received a projection from his financial staff warning that Full Tilt Poker would run out of all cash within months. Notwithstanding this report, BITAR continued to approve "profit" distributions of approximately $10 million per month to himself and Full Tilt Poker's other owners, further decreasing the company's cash on hand and its ability to repay its customers.

14

24.    Additionally, even as Full Tilt Poker's cash precipitously decreased, Full Tilt Poker's customer service department continued to send form e-mails stating that player funds were held in "segregated" or "separate" accounts. Additionally, the company continued to insist in public statements that player funds were "safe and secure."  For example, on or about November 12, 2010, Full Tilt Poker issued a press release reviewed by defendant RAYMOND BITAR that stated "we would like to assure all players that their funds are safe and secure in their Full Tilt Poker account. . . ."  Indeed, Full Tilt Poker consistently described itself as offering "safe and secure" internet poker in its press releases and in statements posted on its website.

Lies To Prevent The Scheme From Being Discovered

25.    On or about April 15, 2011, the Federal Bureau of Investigation seized Full Tilt Poker's internet domain name pursuant to a Court order.  Full Tilt Poker then terminated its United States operations and promptly drafted a "message to U.S. customers," approved by defendant RAYMOND BITAR, that said "Please be assured that your funds are safe, and we thank you for your patience while we do everything in our power to have your money returned to you as soon as possible."

26.    On or about April 20, 2011, Full Tilt Poker reached an agreement with the Department of Justice providing

15

that the company could immediately return all of the money owed
to United States players. Full Tilt Poker did not then repay its
customers as its "message to U.S. customers" claimed it was
trying to do, and instead issued a press release on April 20,
2011 asserting that "numerous legal and jurisdictional issues"
prevented immediate repayment. In truth and in fact, however,
Full Tilt Poker could not return player money because, as BITAR
knew, the player money had been spent by the company and
distributed to its owners.  Indeed, Full Tilt Poker's internal
financial statements reported that as of March 31, 2011 the
company owed $390 million to players around the world but had
less than $60 million in its bank accounts.

     27.  Even the limited cash that Full Tilt Poker still
had available after April 15, 2011 was soon threatened by
requests from players outside the United States to withdraw the
balance of their Full Tilt Poker accounts, which Full Tilt Poker
had no ability to pay.  Full Tilt Poker slowed down payments of
there international withdrawal requests – falsely blaming the
delay in one press release on "anti-fraud and anti-money
laundering checks" the company claimed to be conducting – in
order conceal the fact that it simply was out of cash.
Meanwhile, Full Tilt Poker, at the direction of defendant RAYMOND
BITAR, continued to encourage players outside the United States
to make new deposits with the company with the assurance that

16

their money would be safe. In a statement issued on April 15, 2011 to players outside the United States (and repeated in substance at various times thereafter), Full Tilt Poker stated the U.S. enforcement action "in no way affects your ability to play safe and secure online poker in your country.... It is business as usual and we hope you continue to enjoy playing at Full Tilt Poker."

28.   In fact, as defendant RAYMOND BITAR knew, new deposits from players outside the United States were not then "safe and secure" (much less protected in "segregated" accounts). As BITAR was aware, Full Tilt Poker was entirely dependent on new player deposits to meet the backlog of player withdrawal requests and cover the company's operating expenses. For example, on or about June 10, 2011, CC-2 emailed company financial reports to BITAR showing that despite "8 to 9 million per week" from new deposits, the company only had only $2.1 million in "available funds" and had "current outstanding payments" due of $29.1 million, including $12.5 million to pay in "backlogged player withdrawal requests."  CC-2's e-mail noted that the available cash was being divided "back and forth" between "'must pay' invoices" and "withdrawals" in order "to keep movement on both fronts."  All the while, BITAR and defendant NELSON BURTNICK continued to take a salary from the company, collectively receiving several million dollars after April 15, 2011.   In

17

effect, Full Tilt Poker operated what was, by then, nothing more than a Ponzi scheme.

29.   RAYMOND BITAR, the defendant, also sought to conceal the company's worsening financial condition to prevent the scheme from being exposed.   For example, on or about June 12, 2011, BITAR e-mailed CC-1 and other Full Tilt Poker owners that the company should not issue a press release containing what BITAR viewed as bad news because doing so would trigger "a possible new run on the bank" at a time when the company "can't even take a 5 million run."   Similarly, Full Tilt Poker continued to submit financial statements to the AGCC, signed by CC-2, that falsely claimed that the company had cash sufficient to repay all money owed to players when, in truth, the company was essentially insolvent.   The AGCC ultimately concluded that Full Tilt Poker's representations were false and, on June 29, 1011 suspended the company's operations and halted Full Tilt Poker's ability to operate in any jurisdiction.

## Statutory Allegations

30.   From at least on or about October 13, 2006, up through and including on or about June 29, 2011, in the Southern District of New York and elsewhere, RAYMOND BITAR and NELSON BURTNICK, the defendants, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the

United States, to wit, violations of Title 31, United States Code, Section 5363.

31. It was a part and an object of the conspiracy that RAYMOND BITAR and NELSON BURTNICK, the defendants, and others known and unknown, willfully and knowingly, with persons engaged in the business of betting and wagering, would and did knowingly accept, in connection with the participation of another person in unlawful internet gambling, to wit, gambling in violation of New York Penal Law Sections 225.00 and 225.05 and the laws of other states where Full Tilt Poker, Pokerstars and Absolute Poker operated, credit, and the proceeds of credit, extended to and on behalf of such other person, including credit extended through the use of a credit card, and an electronic fund transfer and the proceeds of an electronic fund transfer from and on behalf of such other person, and a check, draft and similar instrument which is drawn by and on behalf of such other person and is drawn on and payable at and through any financial institution, in violation of Title 31 United States Code, Sections 5363 and 5366.

### Overt Acts

32. In furtherance of said conspiracy and to effect the illegal object thereof, RAYMOND BITAR and NELSON BURTNICK, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about January 18, 2007 BITAR e-mailed CC-1 and CC-2 that Full Tilt Poker should track which of its payment processors miscoded United States credit card transactions so that they would appear unrelated to internet gambling.

b.   In or around August 2007, Full Tilt Poker processed credit card payments for gambling transactions under the name "PS3SHOP," using a non-gambling credit card code for the transactions, through a credit card network with headquarters in the Southern District of New York.

c.   On or about January 20, 2009, Full Tilt Poker received an electronic transfer of funds from a gambler located in the Southern District of New York.

d.   On or about February 9, 2010, BURTNICK e-mailed a Full Tilt Poker colleague that the various internet poker processing options all involved "some form or another of 'misrepresentation,'" including methods used by rival Pokerstars.

e.   On or about November 9, 2010, BURTNICK e-mailed colleagues at Full Tilt Poker that the only available payment processing options left in the United States were "crap" and had "potential legal repercussions."

f.   On or about January 11, 2011 a payment processor e-mailed BITAR and BURTNICK to request that Full Tilt Poker advance $1 million to be invested in All American Bank in return for the bank processing Full Tilt Poker transactions.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Unlawful Internet Gambling Enforcement Act: Full Tilt Poker)

The Grand Jury further charges:

33. Paragraphs 1 through 29 and 32 of this Indictment are repeated and realleged as if fully set forth herein.

34. From in or about October 2006 up to and including in or about April 15, 2011, in the Southern District of New York and elsewhere, RAYMOND BITAR and NELSON BURTNICK, the defendants, persons engaged in the business of betting and wagering and persons aiding and abetting persons in the business of betting and wagering, did knowingly accept, in connection with the participation of another person in unlawful internet gambling, to wit, gambling through Full Tilt Poker in violation of New York Penal Law Sections 225.00 and 225.05 and the laws of other states where Full Tilt Poker operated, credit, and the proceeds of credit, extended to and on behalf of such other person, including credit extended through the use of a credit card, and an electronic fund transfer and the proceeds of an electronic fund transfer from and on behalf of such other person, and a check, draft and similar instrument which was drawn by and on behalf of such other person and was drawn on and payable at and through any financial institution.

(Title 31, United States Code, Sections 5363 and 5366; Title 18 United States Code, Section 2).

## COUNT THREE

(Operation of an Illegal Gambling Business: Full Tilt Poker)

The Grand Jury further charges:

35.   Paragraphs 1 through 29 and 32 of this Indictment are repeated and realleged as if fully set forth herein.

36.   From in or about 2004 up to and including in or about April 15, 2011, in the Southern District of New York and elsewhere, RAYMOND BITAR and NELSON BURTNICK, the defendants, knowingly did conduct, finance, manage, supervise, direct, and own all and part of an illegal gambling business, namely a business that engaged in and facilitated online poker, in violation of New York State Penal Law Sections 225.00 and 225.05 and the law of other states in which the business operated, and which business involved five and more persons who conducted, financed, managed, supervised, directed, and owned all and part of that business, and which business had been and had remained in substantially continuous operation for a period in excess of thirty days and had gross revenues of $2,000 in a single day, to wit, the defendants operated and aided and abetted the operation of Full Tilt Poker.

(Title 18, United States Code, Sections 1955 and 2.)

22

## COUNT FOUR

(Conspiracy to Defraud Banks)

The Grand Jury further charges:

37.    Paragraphs 1 through 29 and 32 of this Indictment are repeated and realleged as if fully set forth herein.

38.    From at least in or about 2006, up to and including on or about April 15, 2011, in the Southern District of New York and elsewhere RAYMOND BITAR and NELSON BURTNICK, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344, and wire fraud, in violation of Title 18, United States Code, Section 1343.

39.    It was a part and an object of the conspiracy that RAYMOND BITAR and NELSON BURTNICK, the defendants, and others known and unknown, unlawfully, willfully, and knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain monies, funds, credits, assets, securities, and other property owned by and under the custody and control of that financial institution by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

23

40.   It was further a part and an object of the conspiracy that RAYMOND BITAR and NELSON BURTNICK, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and televison communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, the defendants participated in a scheme involving wire communications to deceive financial institutions and other financial intermediaries into processing and authorizing payments to and from Full Tilt Poker, Pokerstars and Absolute Poker and United States gamblers by disguising the transactions to create the false appearance that they were unrelated to gambling, and thereby to obtain money of, or under the custody and control of, those financial institutions and intermediaries

(Title 18, United States Code, Section 1349).

## COUNTS FIVE THROUGH SEVEN

(Wire Fraud Against Players)

The Grand Jury further charges:

41.  Paragraphs 1 through 29 and 32 of this Indictment are repeated and realleged as if fully set forth herein.

42.  From at least on or about March 19, 2008 up through and including June 29, 2011, RAYMOND BITAR, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, the making of false representations to potential customers regarding the security of funds deposited with Full Tilt Poker in order to induce customers to entrust funds with the company, would and did transmit and cause to be transmitted by means of wire, radio, and televison communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, on or about the dates below BITAR sent or caused to be sent the following wire transmissions, which passed in interstate commerce through New York, New York, in furtherance of the scheme to defraud players:

| COUNT | DATE OF WIRE | TYPE OF WIRE |
|-------|--------------|--------------|
| FIVE | July 18, 2008 | Posting of message regarding separate player accounts on internet forum |
| SIX | September 7, 2010 | Transfer of $250,000 from Full Tilt Poker bank account to Raymond Bitar |
| SEVEN | February 14, 2011 | Transfer of $1,000,000 from U.S. payment processor to Full Tilt Poker |

(Title 18, United States Code, Section 1343 and 2).

## COUNT EIGHT

(Money Laundering Conspiracy: Promotion)

The Grand Jury further charges:

43.   Paragraphs 1 through 29 and 32 of this Indictment are repeated and realleged as if fully set forth herein.

44.   From at least in or about 2006, up to and including in or about June 29, 2011, in the Southern District of New York and elsewhere, RAYMOND BITAR and NELSON BURTNICK, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Sections 1956.

45.   It was a part and an object of said conspiracy that RAYMOND BITAR and NELSON BURTNICK, the defendants, and others known and unknown, would and did transport, transmit, transfer and attempt to transport, transmit, and transfer a

monetary instrument and funds to a place outside the United

States from and through a place in the United States, with intent

to promote the carrying on of specified unlawful activity, to

wit, the operation of Full Tilt Poker, Pokerstars and Absolute

Poker, in violation of Title 18, United States Code, Section

1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h)).

## COUNT NINE

(Money Laundering Conspiracy: Use Of Funds)

The Grand Jury further charges:

46.   Paragraphs 1 through 29 and 32 of this Indictment

are repeated and realleged as if fully set forth herein.

47.   From at least in or about 2006, up to and

including in or about June 29, 2011, in the Southern District of

New York and elsewhere, RAYMOND BITAR and NELSON BURTNICK, the

defendants, and others known and unknown, willfully and knowingly

did combine, conspire, confederate and agree together and with

each other to violate Title 18, United States Code, Sections

1957.

48.   It was a further a part and an object of the

conspiracy that RAYMOND BITAR and NELSON BURTNICK, the

defendants, and others known and unknown, in an offense that took

place in the United States, willfully and knowingly would and did

engage in monetary transactions in criminally derived property of

a value greater than $10,000 and which was derived from specified unlawful activity, to wit, the operation of illegal gambling business Full Tilt Poker, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

## COUNT TEN

(Unlawful Internet Gambling Enforcement Act: PokerStars)

The Grand Jury further charges:

49.   From in or about October 2006 up to and including in or about December 2007, in the Southern District of New York and elsewhere, NELSON BURTNICK, the defendant, a person engaged in the business of betting and wagering and persons aiding and abetting persons in the business of betting and wagering, did knowingly accept, in connection with the participation of another person in unlawful internet gambling, to wit, gambling through PokerStars in violation of New York Penal Law Sections 225.00 and 225.05 and the laws of other states where PokerStars operated, credit, and the proceeds of credit, extended to and on behalf of such other person, including credit extended through the use of a credit card, and an electronic fund transfer and the proceeds of an electronic fund transfer from and on behalf of such other person, and a check, draft and similar instrument which was drawn by and on behalf of such other person and was drawn on and payable at and through any financial institution.

(Title 31, United States Code, Sections 5363 and 5366; Title 18
United States Code, Section 2).

## COUNT ELEVEN

(Operation of an Illegal Gambling Business: PokerStars)

The Grand Jury further charges:

50.   From at least in or about 2005 up to and
including in or about December 2007, in the Southern District of
New York and elsewhere, NELSON BURTNICK, the defendant, willfully
and knowingly did conduct, finance, manage, supervise, direct,
and own all and part of an illegal gambling business, namely a
business that engaged in and facilitated online poker, in
violation of New York State Penal Law Sections 225.00 and 225.05
and the law of other states in which the business operated, and
which business involved five and more persons who conducted,
financed, managed, supervised, directed, and owned all and part
of that business, and which business had been and had remained in
substantially continuous operation for a period in excess of
thirty days and had gross revenues of $2,000 in a single day, to
wit, the defendants operated and aided and abetted the operation
of Pokerstars.

(Title 18, United States Code, Sections 1955 and 2.)

## FORFEITURE ALLEGATION AS TO COUNT THREE AND ELEVEN

51. As a result of committing the gambling offenses
alleged in Count Three and Count Eleven of this Indictment,

29

RAYMOND BITAR and NELSON BURTNICK, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes and is derived from proceeds traceable to the commission of these gambling offenses with which they are respectively charged, and, pursuant to 18 U.S.C. § 1955(d), all property, including money, used in committing these gambling offenses, and all property traceable thereto, including but not limited to the following:

      a.   A sum of money representing the amount of proceeds obtained as a result of operation of the unlawful gambling businesses alleged in Counts Three and Eleven and the amount of property used in committing the gambling offenses alleged in Counts Three and Eleven, delineated as follows:

      (1)  With respect to Count Three, the operation of Full Tilt Poker, at least approximately $1 billion in U.S. currency;

      (2)  With respect to Count Eleven, the operation of PokerStars, at least approximately $1.5 billion in U.S. currency; and

      b.   All of the defendants' right, title, and interest in the following entities and businesses:

      (1)  Full Tilt Poker,

      (2)  Oldford Group Ltd.,

      (3)  Rational Entertainment Enterprises Ltd.,

     (4)   Pyr Software Ltd.,

     (5)   Stelekram Ltd.,

     (6)   Sphene International Ltd.,

     (7)   Tiltware LLC,

     (8)   Kolyma Corporation A.V.V.,

     (9)   Pocket Kings Ltd.,

     (10) Pocket Kings Consulting Ltd.,

     (11) Filco Ltd.,

     (12) Vantage Ltd.,

     (13) Ranston Ltd.,

     (14) Mail Media Ltd., and

     (15) Full Tilt Poker Ltd.;

    c.   All of the defendants' right, title, and interest in funds and other property held in the following domestic accounts:

     (1)  account numbered 800801483 held at Comerica Bank, Dallas, Texas, in the name of Raymond Bitar, and all funds traceable thereto; and

     (2)  account numbered 800922552 held at Comerica Bank, Dallas, Texas, in the name of Raymond Bitar, and all funds traceable thereto;

    d.   All of the defendants' right, title, and interest in funds and other property held in the following foreign accounts:

(1)   account numbered 60092074136054 held at Natwest, Jersey, in the name of Raymond Bitar, and all funds traceable thereto;

(2)   account numbered 95434087766 held at Natwest, Channel Islands, in the name of Raymond Bitar, and all funds traceable thereto;

(3)   account numbered 91707289 held at Bank of Ireland, Ireland, in the name of Raymond Bitar, and all funds traceable thereto;

(4)   account numbered 99045014745206 held at Bank of Scotland Ireland, Inc., Ireland, in the name of Raymond Bitar, and all funds traceable thereto;

(5)   account numbered 95151380025186 held at National Irish Bank, Ireland, in the name of Raymond Bitar, and all funds traceable thereto;

(6)   account numbered 95151340062618 held at National Irish Bank, Ireland, in the name of Raymond Bitar, and all funds traceable thereto;

(7)   account numbered 26257031 held at Allied Irish Bank, Ireland, in the name of Raymond Bitar, and all funds traceable thereto;

(8)   account numbered 7262 held at Wirecard Bank AG, Germany, in the name of Raymond Bitar, and all funds traceable thereto; and

32

(9)   account numbered 7244 held at Wirecard Bank AG, Germany, in the name of Raymond Bitar, and all funds traceable thereto;

e.   All of the defendants' right, title, and interest in the following property:

(1)   all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1506 Forest Oaks Drive, Glendora, California, 91741; and

(2)   all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 752 Rainbow Drive, Glendora, California, 91741.

## FORFEITURE ALLEGATION AS TO COUNT FOUR

52.   As a result of committing the offense of conspiring to commit bank fraud as alleged in Count Four of this Indictment, RAYMOND BITAR and NELSON BURTNICK, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982, and 28 U.S.C. § 2461, all property constituting or derived from proceeds obtained directly and indirectly as a result of the offense alleged in Count Four, including but not limited to, all of the defendants' right, title, and interest in the accounts and property described in paragraph 52, which are incorporated by reference herein.

## FORFEITURE ALLEGATION AS TO COUNTS FIVE, SIX AND SEVEN

53.  As a result of committing the offense of wire fraud as alleged in Counts Five, Six and Seven of this Indictment, RAYMOND BITAR, the defendant, shall forfeit to the United States, pursuant to pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property constituting or derived from proceeds obtained directly and indirectly as a result of the offenses alleged in Counts Five through Seven, including but not limited to, at least approximately $41 million in U.S. currency, and all of the defendants' right, title, and interest in the accounts and property described in paragraph 52(c), (d) and (e), which are incorporated by reference herein.

## FORFEITURE ALLEGATION AS TO COUNTS EIGHT AND NINE

54.  As a result of committing the offense of conspiring to commit money laundering as alleged in Counts Eight and Nine of this Indictment, RAYMOND BITAR and NELSON BURTNICK, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), all property, real and personal, involved in the offenses alleged in Count Nine, and all property traceable to such property, including but not limited to the following:

a.  A sum of money of at least $2.5 billion in United States currency.

b.  All of the defendants' right, title, and interest in the entities, businesses, and accounts described in paragraph

34

52(b), (c), (d), and (e) which are incorporated by reference herein.

## Substitute Assets Provision

55. If any of the forfeitable property described in paragraphs 51 through 54 above, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982, and 1955; Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA
### - v -
### RAYMOND BITAR,
### and
### NELSON BURTNICK

Defendants.

### INDICTMENT

S8 10 Cr. 336 (LAK)

(18 U.S.C. §§ 371, 1343, 1349, 1955,
1956(h), and 2.)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

6/28/12 - Filed Sealed Superseding Indictment
Arrest Warrants issued.

Judge Francis
USMJ.